No. 28.—The Mayor and Council of Columbus, plaintiffs in error, *vs.* Elizabeth Howard, administratrix, defendant.

[1.] A count in trover in the usual form is not demurrable; the Statute of 1847, prescribing a special form of declaration for the recovery of personal property being *permissive* only, and not compulsory.

[2.] Offers of compromise, with a view to settle or prevent litigation, are inadmissible; but an independent acknowledgement of a fact may be received, although made pending a treaty for the amicable adjustment of a controversy.

[3.] If the finding of the Jury is in conformity with the charge of the Court, and no complaint is made of the charge, the refusal to set aside the verdict and grant a new trial will not be reversed, although the law may not have been properly submitted, the corrective Court being satisfied with the verdict.

[4.] There is, on the part of the hirer, an implied obligation, not only to use the thing hired with due care and moderation, but also, not to apply it to any other use, or detain it beyond the time for which it was hired.

[5.] If the thing hired is used for a different purpose from that which was intended by the parties, or in a different manner, or for a longer period, the hirer is not only responsible for all damages, but if a loss afterwards occurs, although by inevitable casualty, he will generally be responsible therefor.

[6.] The contract of hire being one of mutual benefit, the hirer is bound only for ordinary diligence, and of course is responsible only for ordinary negligence, or for that degree of care and diligence which the generality of mankind use in keeping their own goods of the same kind.

Trover, in Muscogee Superior Court. Tried before Judge Alexander, November Term, 1848.

Elizabeth Howard brought suit against the City Council of

Columbus. The declaration contained two counts. The first, in trover, for a certain negro slave, Braden; the second, in case, setting out that she had hired a certain negro, Braden, to the City Council, for the year 1844, to be employed, specifically, in working the streets of said City, in cleaning and repairing the same; that the Council placed the said negro to do other work, to wit: "to work upon, by and under the precipitous bank at the mouth of the sewer or drain of said City," and that by the breaking and falling off of said bank the slave was killed.

Counsel for defendants below demurred to the first count in the declaration, which demurrer was overruled by the Court, and the defendants excepted.

Upon the trial, plaintiff offered Washington Toney as a witness, who swore that he was a member of the City Council in the year 1844; that he knew, officially, of the death of plaintiff's negro, Braden, who was hired by Council. After the negro was killed, Council took action upon the subject, and admitted that he was the property of Mrs. Howard, and was killed at the sewer, in their employment; that the action consisted in appointing a committee, of which he was chairman, to confer with the attorney of Council, Mr. Wiley Williams, upon the propriety and justice of paying for the boy.

To this testimony as to the admissions of Council, defendants' counsel objected, which objection was overruled by the Court, and defendants excepted.

Witness further testified, that he saw the negro soon after the injury, and just before his death, near the place; that the place where the injury was inflicted was pointed out to him, and the broken fragments which had fallen down; that the negro died soon and violently from the injury there incurred; that the bank resembled a platform projecting over, and the space through which it fell was some ten feet, more or less, and the portion that fell off would weigh about two thousand pounds; that the consistency of the soil, as he recollected, was of a fine, sandy and argillaceous loam, easily crumbled; he observed the traces of a trench, some twelve feet long and about four inches deep, at the line marking the slide, which appeared to be freshly dug; this trench was immediately above the pieces of the fallen bank, and was pointed out to him at the time.

Peterson Thweatt testified, that as agent of Mrs. Howard, he

hired the negro to the Council, to work on the streets; the negro was worth $600 or $650; that after the negro was killed, he as agent, applied for payment of his value from the City Council, who refused, on consultation with their attorney; some of them, however, being favorable to its payment.

For the defendants, John J. McKendree testified, that in 1844, he was a member of Council and hired the negro, Braden, from P. Thweatt; that he did not hire him to work on the streets exclusively; that the City work consisted in working on the streets, digging ditches, filling up holes, working on the abutments of the bridge, and doing every thing which Council ordered, conducive to the health, comfort and convenience of the City, and that he would not have hired the negro if it were not to do the work of the City generally; that previous to the death of this negro, so far as he knew, Council had never done any work on a sewer, or the abutments of the bridge, or in pulling down old walls left after fires, but had only worked on the streets and on one ditch.

John Quin testified, that he was a member of Council for the year 1844, and Chairman of the Committee on Streets; that the boy Braden was directed to work on the sewer by the City Council; that the sewer was in one of the streets, and that the City hands worked upon the river banks, and upon ditches, and upon water-drains, during that year; that Council never made any admissions, but to act upon the proposition to settle, made through Thweatt, so far as he knew.

E. C. Bandy and J. M. Hughes testified, that they were Marshal and Deputy Marshal for the year 1844, and were present when the boy Braden was killed; he and seven or eight others were at work on the sewer, grading the bank or ravine at the mouth of the sewer, which was about twenty feet deep and very large; that the earth there was stiff clay at the top, so much so that they had to drive in gluts to break it off to grade it; that while Braden and one other hand were throwing dirt out of the way, suddenly a piece broke loose from above, and in falling caught Braden while he was stooping down to scoop up the dirt with a spade; that when the mass broke loose it fell as quick as lightning.

The Court charged the Jury, that if the defendants had the negro in their employment as contemplated by the contract of hire, and if, while in such employment, said negro was killed

without any neglect on the part of said defendants, or their agents, that then the defendants were not liable, and if such was not the case, then the defendants were liable.

The Jury returned a verdict for the plaintiff for $800.

Whereupon, defendants moved for a new trial:

1st. Because the verdict is contrary to the evidence and the charge of the Court.

2d. Because the Court erred in admitting the evidence of witness Toney, as to the admissions of Council.

Which motion was overruled and defendants excepted.

And upon these several exceptions error has been assigned.

JOHNSON & WILLIAMS, for plaintiffs in error, cited and commented on the following authorities:

1 *Kelly*, 68, 257.    3 *Ib.* 80, 427.    4 *Georgia R.* 376, 170, 193, 360, 428.    1 *Greenl. on Ev.* 295, *and authorities cited.    Story on Bailment*, 390, 404, *and authorities cited.*    9 *Cowen*, 530.

H. L. BENNING, for defendants.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] Was the Circuit Court right in refusing to strike out the count in trover in the declaration?

The object of pleading is for both parties to state their cases—the claim of one and the defence of the other. The rules of pleading are founded, undoubtedly, in reason and good sense, and accuracy and justice were their object. They were intended, however, for a comparatively ignorant age, and like all things human, they are susceptible of improvement, and should, undoubtedly, be adapted to the advanced state of the age and of modern jurisprudence. Whatever of good sense they contained should be preserved; their subtlety and prolixity should be abandoned.

The first and great rule of pleading should be, to compel the litigant parties to disclose fully, plainly and distinctly, the real nature of their respective pretensions. And I feel constrained to admit, that the fiction in trover fails to convey any very definite idea or information upon the subject of the action. The very same words, as

might be readily shown, would apply equally to a dozen different causes of action. And yet the Legislature has not seen fit to administer the proper corrective.

Previous to 1847, they had had the subject matter of this proceeding directly under consideration, and made no change in the plan of declaring. In 1847, the Legislature prescribed a form of action for the recovery of personal property; still it was not made obligatory on parties plaintiff to adopt it. It was left to their option. They contented themselves with providing that no departure from the "*prescribed form*" should work a nonsuit, pro vided the plaintiff, in following the new form, should plainly and distinctly set forth his cause of action.

It is obvious, therefore, that no *Court* is at liberty to *compel* a party to abandon the old form, the Legislature itself having refrained from going so far.

[2.] Next, as to the competency of the admissions made by members of the City Council. Counsel for the defendants sought to exclude them, under the rule of evidence which protects overtures made between litigating parties, with a view to an amicable adjustment; but the acknowledgments here made and attempted to be proven, do not fall within that rule. The rule itself is founded in public policy. There should be no discouragement to compromising disputes, for fear that if not completed, the party making advances may be injured. Independent facts, however, admitted during the treaty for a compromise, may be given in evidence as confessions. This limitation or exception is laid down in *Starkie, Phillips* and *Greenleaf,* and has been recognized in reported cases. *Marsh vs. Gold,* 2 *Pick.* 285. *Sanborn vs. Wilson,* 4 *N. Hamp. R.* 508. *Hyde vs. Stone,* 7 *Wendall,* 354. *Hartford Bridge Co. vs. Granger,* 4 *Conn. R.* 142. *Fuller vs. Hampton,* 5 *Conn. R.* 417. *Delogny vs. Rentoul,* 2 *Martin's Loui. Rep.* 175. *Hamblett vs. Hamblett,* 6 *New Hamp. R.* 342, '43. 1 *Moody & Malk.* 466. *Per Lord Kenyon,* 1 *Esp.* 143. *Anthon's Rep.* 190. 4 *Cowen,* 635. In *Slack vs. Buchanan, Lord Kenyon* went so far as to hold, that he would receive evidence of all admissions, such as the party would be obliged to make in answer to a bill in Equity, rejecting none but such as are merely concessions for the sake of making peace and getting rid of a suit. *Peake's Cases,* 5, 6. It was ruled in the same case, that admissions made before an arbitrator are receivable in a subsequent

trial of the cause, the reference having proved ineffectual. See, also, *Gregory vs. Howard*, 3 *Esp.* 113.

It will be seen, by reference to the testimony, that the admissions were made merely because they were facts; that there was nothing confidential in them, and that they had no reference whatever to a compromise, there being no treaty proposed or pending for any such purpose.

[3.] A verdict having been rendered for the plaintiff, a motion was submitted for a new trial:

1st. Because the finding was contrary to evidence and the charge of the Court: and

2d. Because the Court erred in admitting the evidence of Washington Toney as to the admissions of the City Council.

The application being refused, defendants, by their counsel, excepted.

We have already disposed of the *second* ground, in the motion for a new trial. It only remains, therefore, to inquire whether the verdict was contrary to the evidence and the charge of the Court. The Court charged the Jury, that if the defendants had the negro in their employment, as contemplated by the contract of hire, and he was killed without any neglect on their part, that then they were not liable, otherwise they were.

It is not complained that the law of the case was not correctly stated. But assuming that to be true, a re-hearing is asked, because the verdict is contrary to the charge. Surely it will not be pretended that there was not *some proof* of negligence, and if so then the verdict was not contrary to the charge.

[4.] The law, we apprehend, is this: there is, on the part of the hirer of property, an implied obligation not only to use the thing, be it servant or horse, or any thing else, with due care and moderation, but also not to apply it to any other use than that for which it was hired. If a horse is hired as a saddle horse, the hirer has no right to use the horse in a cart, or to carry loads as a beast of burden. So, if a carriage and horses are hired for a journey to Boston, the hirer has no right to go with them on a journey to New York. So, if horses are hired for a week, the hirer has no right to use them for a month. So, if a negro is hired to work *on the streets* of the City of Columbus, the City Council have no right to employ him in blasting wells, pulling down old walls, or levelling dangerous and precipitous embank-

ments, although the work be *within* the limits of the streets, as delineated in the map of the town.

[5.] And it may be generally stated, that if the thing is used for a different purpose from that which was intended by the parties, or in a different manner, or for a longer period, the hirer is not only responsible for all damages, but if a loss occurs, although by inevitable casualty, he will generally be responsible therefor. Such misuse is deemed, at the Common Law, a conversion of the property, for which the hirer is generally held responsible to the letter, to the full extent of the loss. *Story on Bailments*, §413. 1 *Cow.* 322. *Jones on Bailments*, 68. 2 *Lord Raymond*, 915. 12 *Pick.* 136. 3 *Pick.* 492. 5 *Mass. R.* 104. 1 *Const. Rep. S. C.* 121.

[6.] The question has been much mooted, what degree of care or diligence is required of the hirer, while using the property for the purpose, and within the time for which it was hired. *Sir William Jones* considered that the contract being one of mutual benefit, the hirer was bound only for ordinary diligence, and of course was responsible only for such. *Jones on Bailments*, 86, 87, 120. And this opinion appears to be now settled, upon principle, to be the true exposition of the Common Law. 2 *Kent Com. Lect.* 40. 3 *Cowp. Rep.* 4. 13 *Johns.* 211. 2 *Brod. & Bing.* 359. 7 *Cowen R.* 497. *Gilpin*, 579, 585, 586. He ought, therefore, to use the thing, and to take the same care in the preservation of it, which a good and prudent father of a family would take of his own. Hence the hirer of a thing, being responsible only for that degree of diligence which all prudent men use, that is, which the generality of mankind use, in keeping their own goods of the same kind, it is very clear he can be liable only for such injuries as are shown to come from an omission of that diligence ; or, in other words, for ordinary negligence. If a man hires a horse, he is bound to ride it moderately, and to treat it as carefully as any man of common discretion would his own, and to supply it with suitable food ; and if he does so, and the horse, in such reasonable use, is lamed or injured, he is not responsible for any damages. *Story on Bailments*, 391, 392. 4 *Barn. & Ald.* 21. 3 *Esp. R.* 79. 5 *Miller's Louisia. R.* 7, 9.

Now, test the verdict by either of these principles, and we are satisfied that it was warranted by the testimony. The Jury were authorized to find, that there was a special contract of hiring, and

that the death of the slave resulted from his being used for a different purpose from that intended by the parties, or else, that the loss ensued from gross negligence on the part of the Council. The want of discretion in our slave population is notorious. They need a higher degree of intelligence than their own, not only to direct their labor, but likewise to protect them from the consequences of their own improvidence. From the testimony of Toney, it is manifest that, considering the locality and nature of the soil, &c. the situation of the slave was one of imminent risk and exposure. We are, therefore, satisfied with the verdict.

Let the judgment be affirmed.