Macon & Western R. R. Co. *vs.* Holt.

No. 27.—The Macon & Western Rail Road Company, plaintiff in error, *vs.* Philip S. Holt, defendant in error.

[1.] A permit or ticket to a slave, must specify the length of time that he is to be absent, and the places which he is allowed to visit.

[2.] The Macon & W. R. R. Company took on board their cars the slave of H, having a general pass, and without the knowledge and consent of H, to transport him to a given point, for the usual fare for negroes: *Held*, that this was a conversion of the slave, and that the company are liable for all the injuries which he received, whether they occurred by the negligence of the company or otherwise.

[3.] The black color of the African race is *prima facie* evidence of slavery.

Action on the case, in Bibb Superior Court.   Tried at July Term, 1849, before Judge Floyd.

A slave named Jacob, the property of Philip S. Holt, having an ordinary " pass" to go from Macon to his owner's place, some eight or ten miles out, was received by the officers of the plaintiff in error, on board its freight train of cars, for the usual passage money for slaves riding on the freight train.   The negro, in getting from the cars, within 250 or 300 yards of the station to which he had paid, (the cars being still in motion,) *had his leg broken.*   The master had no knowledge that the negro was going to ride on the cars, and it appeared in proof, that there was no negligence by the company ; that the negro *jumped off*, of his own accord, just before reaching the eight mile post, to which he had paid, while the motion was about as fast as a man could walk.

The bill of exceptions arises alone out of the charge of the Court, to this part of it—" If the company took the negro on their cars, without the knowledge and consent of the owner, and he be injured by negligence or *otherwise*, the company will be liable, though the negro have a general pass."

Holt recovered below, and the company excepts on the ground stated.

Poe and Nisbet, for plaintiff in error.

Powers and Whittle, for defendant.

·*By the Court.*—NISBET, J. delivering the opinion.

The facts in this case are few and simple. Jacob, a slave, belonging to Mr. Holt, the defendant in error, having in his possession what the witness designates as "an ordinary pass," was received on board the cars of the plaintiffs in error, the Macon & Western Rail Road Company, to be transported, for the ordinary fare for negroes, from Macon to the eight mile post above, on the road. Upon approaching the point at which he was to leave the train, its progress was impeded with a view to stop and let him off. Before reaching that point, and the train moving " about as fast as a man can walk," he jumped off and fractured his leg—it was afterwards amputated; and this action was brought by the defendant in error, to recover of the company damages for the injury sustained by the slave. No negligence of any kind is imputable to the company or any of its agents. Upon the trial below, Judge *Floyd* instructed the Jury, " that if the negro was on board the cars with the consent of his owner, or with his knowledge, and no prohibition be given by the owner, then, if the company take ordinary care, and he be injured by his own volition, the company will not be liable; *but if the company take the negro on the cars without the knowledge and consent of the owner, and he be injured, by negligence or otherwise, the company will be liable, though the negro have a general pass.*" To the last division of this charge, exception is taken by the Macon & Western R. R. Company, and the question for the review and determination of this Court is, whether there is error in that part of the instructions of Judge *Floyd* to the Jury.

[1.] By *general pass*, the presiding Judge, no doubt, meant the ordinary permit or ticket which the law requires to be given to slaves, to protect them from being whipped, when found away from the plantations, not being in company with some white person. By the Act of 1770, when so found, they are liable to be taken up and whipped, not exceeding twenty lashes. *Prince*, 778. By the Act of December, 1829, the character of this permit is defined. It is therein enacted, "that it shall be the duty of every owner, overseer, trustee, guardian or other person or persons, having control of any slave or slaves, or free persons of color, in granting or giving written permits to the same, to set

forth the time allowed for their absence, and distinctly designate the place or places where such slaves or free persons of color desire to visit." *Hotchkiss*, 815. The testimony of the witness in this case is, that the slave, Jacob, had *an ordinary pass*, and the presiding Judge, in his charge, speaks of a *general pass*. We infer that the Judge referred to such a permit as is required by the Act of 1829. No permit, more general than that Statute requires, would be a lawful pass—one in conformity with it, would be *a general pass*. An owner, overseer, trustee, guardian or other person, having control of slaves, can unquestionably authorize them, in writing, to do or not to do, any thing not forbidden by the laws. They may thus permit them to travel from place to place on the rail roads; and such a liscense would protect both the slave and the company. A general pass, however, such as I have defined it to be, was held by Judge *Floyd*, to be no protection to a *rail road company* against damages for injury to a slave, taken on board the cars without the knowledge and consent of the owner ; and, in our judgment, correctly held. It conveys no authority to the slave to place himself on the cars—it clothes him with no contracting power, for and on account of the owner—it confers upon others no right of control over him whatever, much less a right to *convert* him to their uses for profit—it is not evidence of the assent of the owner, except according to its terms—it proves the master's consent that the slave may, for a time specified, leave his home, and this includes the privilege of enjoying that time in such way as he may choose to occupy it, in conformity with the laws of the State, and it also proves his consent that he shall visit the place or places specified—it proves nothing more. It is made the duty of the owner, by law, not to permit his slave to leave his plantation without a ticket—it is the right of the slave, founded in his character as a sentient human creature, and in the obligations of humanity, when leaving his master's protection, with his consent, to have the protection which the permit affords against punishment. The permit originates in the necessity of a vigilant police—its object is, primarily, protection against the penalties of the patrol laws ; which laws, however necessarily stringent, operate humanely and beneficially for the slave, as well as the master, and the whole body of the community. Such, and no more, are the offices of a *general pass*. In this case, and in no analagous case, does it shield the company, or

any other person or persons, occupying their position relatively to the slave, from liability, if injury accrues to him. I dismiss, therefore, so much of the instruction as relates to the *general pass*, with this remark, that it will be seen, from the whole drift of this decision, that neither rail road companies, nor any other person, will be safe in the transportation of slaves, without a specific written authority from the owner, or his consent, so in some other way manifested, as that it will be susceptible of proof.

[2.] Disencumbered, then, of all considerations which grow out of the pass in this case, the legal proposition asserted by the learned Judge, presiding on the Circuit Bench, is this, to wit : "If a company take the slave of another on board their cars, without the knowledge and consent of the owner, and he be injured, by negligence or otherwise, the company will be liable to respond in damages for the injury." The instruction given must be understood in the light of the facts of the case made in the record. It is in evidence, that this company received this slave, to transport him, for *a compensation* taken from him. This fact is an important one in this case. When, therefore, the Judge speaks of a company taking a negro on their cars, he means taking him, as the company did in this case, to be transported for their benefit, in the receipt of the customary fare for such transportation.

Again, the taking, by the charge, must be not alone without the *knowledge* of the owner, but also without *the consent* of the owner. If he had ruled, that the company would be liable if they took the negro singly without the *knowledge* of the owner, the inference would be a fair one that, with his knowledge, they would not be liable, and that is not necessarily always true in law. We understand the Judge to say, that in order that the company shall be protected, the owner must both know and consent to the taking. He could not consent without knowledge, but he might know without consenting. In the case put, as thus understood, the Court holds that the company is liable, whether the injury result from the negligence of the company, *or otherwise;* that is to say, they are liable, wholly irrespective of the question of negligence, and thus we arrive at the true *status* of the point for review.

I do not consider that the decision of this question depends upon any new principles. We have determined it upon principles of the *Common Law,* long settled and familiar to the juris-

prudence of Great Britain and of our own States. The interest of the question springs out of the application of those principles to a class of statutory persons, to wit : *rail road corporations,* unknown to the Courts of either country until within a very recent period, and to a class of subjects (negro slaves) not recognised as property in England, and peculiar here, in this, that whilst they are in fact property, under our laws, they are sentient, reasoning human agents. In its practical consequences, the judgment we now render is an important one.

The effort of the able counsel for the plaintiffs in error, (Mr. *Poe,*) was, first to establish that this is a case of bailment, and thus make the plaintiffs in error liable only for negligence; and particularly, that it belongs to the class designated as *mandates ;* and more particularly still, that it falls within that class of *mandates* which arises under what is called the *quasi contract of negotiorum gestor*—where, for example, "a party spontaneously, and without the knowledge or consent of the owner, intermeddles with his property, as to do work on it, or to carry it to another place." *Story on Bailment,* §189. If this be a bailment at all, it must belong to this class. By the evidence, there was no contract between the owner, Mr. Holt, and the rail road company. All bailments, except *mandates of the negotiorum gestor* class, are founded in contract, express or implied. As, then, there was in this case confessedly no contract, but a taking of the slave, spontaneously, without the knowledge or consent of the owner, it must belong to that class or none. In cases of this sort, (of the *negotiorum gestor* sort,) as the mandatory acts wholly without authority, there can be, strictly speaking, no contract. *Story on Bailment,* §189. A *quasi mandate* is raised by implication, and that for the benefit, not of the mandatory, *but of the owner.* The intermeddler is left to all the liabilities of his act, whatever the circumstances of the case may make them, whilst the owner of the property is allowed, at his election, to treat the transaction' as a contract of *mandate* or otherwise, according as his interest may require or suggest. This appears to be the footing upon which the Roman law places this species of mandate. *Pothier's Appendice du Quasi Contrat. Negot. Gest. Appendice Contrat de Mandat, n.* 167. *Story on Bailm.* §189. It does not seem to be fully recognized by the Common Law. The English Courts appear only to have invoked the principle of implication, for the

benefit of the owner, in a few instances: As, where there has been a subsequent ratification of the acts of the *gestor* by the owner; and sometimes where unauthorized acts are done, positive presumptions are made, by law, for the benefit of particular parties. Thus, if a stranger enters upon the lands of an infant and takes the profits, the law will, in many cases, oblige him to account to the minor for the profits, as his bailiff; for it will be presumed, that he entered to take them in trust for the infant. 1 *Dane's Ab. ch.* 8, *art.* 2, §10. .1 *Bac. Ab. Account. Coke Litt.* 89 *b.* 90 *a. Story on Bailment, p.* 205. Actions on mandates are very uncommon in our Courts, for the reason, not flattering to human nature, given by Sir *Wm. Jones,* that it is very uncommon for men to undertake any office of trouble without compensation. *Jones on Bailment,* 57.

The rule of liability of the *negotiorum gestor,* varies according to his character and employment, and the circumstances attending the transaction. Suffice it to say, that he is not, in general, liable, without negligence, and if so, the case before us being held to belong to the class of the *negotiorum gestor,* the instruction of the Court below would be erroneous. In Louisiana, it has been held, that if one spontaneously and *gratuitously* take the slave of another, without his knowledge or consent, and the slave escape and is lost to the owner, such an one will not be liable, unless there was gross negligence on his part. *Bayon vs. Prevot,* 4 *Martin's R.* 65. *Code of Louisiana, articles* 2274, 2275. *Story on Bailment,* §§217, 577. See, also, *DeFonclair vs. Shottenkirk,* 3 *Johns. R.* 170. *Beverly vs. Brooke,* 2 *Wheat. R.* 100.

The question remains, Is the case at this bar a mandate of this class? Demonstrably it is not, and for one obvious and satisfactory reason: A necessary element in every *mandate,* and particularly in this, is that the taking of the property *be gratuitous.* If the receiving of Mr. Holt's slave on their cars, by the plaintiffs in error, had been by his consent and authority, then it would have been a familiar and very intelligible bailment, subject to the government of settled legal principles. But that is not this case. If they had taken him *gratuitously,* without the knowledge or consent of Mr. Holt—in that event, under certain circumstances, the case would belong to the class of mandates I have been considering. But they did not so take him; but, on the contrary, they received him to transport to the eight mile post, above Ma-

con, for their *profit and advantage.* One of the witnesses testifies, that they received from the negro twenty-five cents, to carry him to that point.    The transportation of the slave was not a charity— it was not gratuitous—it was not for the mutual benefit of themselves and the owner; for he neither assented to nor knew of the transportation.    It is true, that it was an accommodation to the slave, and it was done at his instance; but I need scarcely remark, that the slave could make no contract to bind his master, or in any way make him a party to the transaction, without his consent.    The slave must be considered in the light of property, and in no other.    There are cases where the intellectual and moral character of the slave does modify the general law of bailments, as we shall see, but this is not one of them.    All mandates are gratuitous.    "The contract (says Mr. *Story*) must be gratuitous, and this is of the very essence of the contract; for if any compensation is to be paid, it passes into another contract; that is to say, the contract of hire."    *Mandatum, nisi gratuitum, nullum est.    Story on Bailment,* §153.    *Dig. Lib.* 17, *tit.* 1, 1, 1, §4. *Pothier's Pand. lib.* 17, *tit.* 1, *n.* 15.    *Pothier's Contrat de Mandat, n.* 22.    It does not vary the matter, that the mandate of the *negotiorum gestor* is without a contract.    In that case, as in other mandates, the law goes upon the idea of the mandatory acting without profit to himself; but I trust I shall show, aside from all these views, that the law gives to this transaction a definite character, and that that character is wholly inconsistent with the idea of a bailment of any kind.    The opinion of Lord *Ellenborough,* in a case supposed by him, in *Drake vs. Shorter,* (4 *Esp. R.* 165,) was strongly relied upon by counsel for the plaintiffs in error. The case supposed was this: A chattel, as a boat, belonging to another person, is taken to do an act of kindness to the owner, as to save other property belonging to him from the flames, and an unintentional injury happens to the boat, in the use of it for that purpose.    In that case, Lord *Ellenborough's* opinion was, that the person taking the boat would not be, in any manner, responsible for it to the owner.    It was insisted, that this case is analogous to the case put by his Lordship, in this: that the taking of the slave Jacob, to carry him home, was an act of kindness to his master— it facilitated his return, and promoted the interest of the owner. The result was very different; for in fact, as a consequence of the slave going on board the cars, he lost his limb, and his value

was greatly depreciated. The owner was in fact injured. But the analogy is not perceived. The case put by Lord *Ellenborough*, goes upon the ground of a *mere kindness*—a charity to the owner—wholly irrespective of the interest of the person taking the boat. In this case, the taking of the slave was *alone* for the interest of the company. The fact of receiving pay for his transportation, conclusively negatives the idea of a kindness, or mere charity to man or master.

If a slave be taken on board the cars, by a rail road company, or be taken by any other carrier, to be conveyed solely in consequence of his distress, and from motives of humanity alone, no reward, hire or freight being to be paid for his passage, the carrier would, in such case, be responsible only for gross neglect. This, I have no doubt, would be the rule in that case; and it was so laid down by Chief Justice Marshall, in *Boyce vs. Anderson*, 2 *Peters*, 150. This, however, is not such a case, and the rule is not applicable.

The decision of the Supreme Court, in the case just referred to, was relied upon as controverting this case. In that case, certain slaves being wrecked on the shore of the Mississippi river, and being in the custody of the agent of the owner, were, at his instance, taken on board the yawl of the steamer Washington, being then in the stream, to be transferred to the steamer, for transportation. In their passage to the steamer, the yawl was upset, and the slaves were drowned. The owner brought an action against the owners of the Washington, for the value of the slaves. The general rule is, that *common carriers* are insurers of the goods bailed to them, and are liable, except for inevitable accidents—that is, the acts of God or the King's enemies. 2 *Kelly*, 352. The Supreme Court determined that this severe rule of the Common Law does not apply to slaves. " A slave, (said Judge Marshall, in delivering the opinion of the Court,) has volition and feelings, which cannot be disregarded. These properties cannot be overlooked, in conveying him from place to place. He cannot be stowed away as a common package. Not only does humanity forbid this proceeding, but it might endanger his life or health. Consequently, this rigorous mode of proceeding cannot be adopted, unless stipulated for, by special contract. Being left at liberty, he may escape. The carrier has not, and cannot have, the same absolute control over him, that he has over inanimate

matter. In the nature of things, and in his character, he resembles a passenger, not a package of goods. It seems reasonable, therefore, that the responsibility of the carrier should be measured by the law which is applicable to passengers, rather than by that which is applicable to the carriage of common goods." Upon this just and humane reasoning, the Supreme Court decided, that carriers of slaves, in the absence of any special contract to the contrary, are liable for injuries done to them, only in the event of their being caused by negligence or unskilfulness. 2 *Peters' R.* 150. *Stokes vs. Saltonstall*, 13 *Peters*, 181, 192. *Story on Bailm.* §577. *Williams vs. Taylor*, 4 *Porter's R.* 234, 238. 4 *McCord*, 223. Were such a case before me, I would unhesitatingly decide in accordance with the rule held by the Supreme Court. It is very apparent, however, that this case is distinguishable from the case before the Supreme Court. That was a contract of bailment, between the owner of the slaves, by his agent, and the Captain of the steamer Washington—the usual case of a contract for carriage, for hire. In this case, there was no contract—the owner neither assenting to, nor having knowledge of, the taking of his slave, by the plaintiffs in error, on board their cars. It has, therefore, no relevancy to this case.

From what has been said, the character of this transaction is already necessarily inferable. The absence of knowledge and consent, on the part of the owner, Mr. Holt, precludes all idea of contract, express or implied; and the fact that the company received pay for the transportation, denies to it the character of a gratuitous or charitable mandate. It does not belong to the Law of Bailment. These two things designate it, unequivocally, as a *tort.* The company *converted* the slave to their use, for profit—they are *tort feasors*, and liable as such; that is to say, they are liable for all injuries, whether they result from negligence or otherwise; and if so, the instruction given by Judge Floyd to the Jury, was according to the law of the case. If there was a *conversion* of this slave, the whole matter is demonstrated; and really, this seems to be so obvious, that it scarcely needs reasoning or authority. That which is not property cannot be converted. Slaves are property; and the negro race in this State are generally slaves, but not universally. Knowledge, therefore, that this negro was a slave, was necessary to make the taking a *tort.*

[3.] The black color of the African race is presumptive evi-

dence of slavery. 19 *Martin's Law R.* 648. *Fox vs. Lambston,* 3 *Halst.* 275. *Ghober vs. Ghober,* 2 *Hayw.* 170. *Burke vs. Joe,* 6 *Gill. & John.* 136. *Nelson vs. Wetmore,* 1 *Richardson,* 218. If this were not the rule, it is in proof, from the pass, that the negro was a slave, and that the company knew it. It was insisted, in the argument, that there was no intention, on the part of the company, to injure the owner—no unlawful or wilful purpose—and therefore, this could not be a *tort*—it could not amount to a conversion. As a matter of fact, this is conceded. The high character of the company forbids (and so do the facts,) any other conclusion. But if the act was unlawful—if it was in derogation of the right of property in the owner—if there was an appropriation of the property of the defendant to their own use—it was a conversion, irrespective of any intent to injure him. Even dominion over property, without use, is conversion. *User* of property, without the consent of the owner, is conversion. These are elementary propositions. If A take the horse of B, and ride him, it is a conversion, even although A afterwards deliver him ; and trover will lie, and the delivery will go in mitigation of damages. So, if the Macon and Western R. R. Co. take the slave of Mr. Holt, and use him, it is a conversion, although they subsequently return him; and an action for damages will lie, and the return of the slave will go in mitigation of damages. This simple statement illustrates and fixes the character of this transaction. Was there, in this case, *an user* of the slave ? Did the company appropriate him to their use ? Suppose that, finding this slave at large on the highway, with a general pass, they had put him to work in an excavation on their road—can it be doubted but, in that case, there would be a user of the slave ? And suppose that, whilst thus engaged, by a slide of the embankment, the slave should lose his life—can it be questioned, that the company would be liable for his entire value ? It has been so held by this Court. In the case of *The City of Columbus vs. Mrs. Howard,* a slave was hired for general purposes, by the City, and put to work in excavating a dangerous embankment, and whilst so at work, lost his life, by the falling in of the earth. We held them liable, and upon the principle, that such service being *outside the contract* of hire, was a conversion—a *tort*. *The Mayor and Council of the City of Columbus vs. Howard,* 6 *Ga. Rep.* 219. *Story on Bailment,* §413. 1 *Cow.* 322. 2 *Lord Raymond,* 915. 12 *Pick.* 492.

Macon & Western R. R. Co. vs. Holt.

5 *Mass.* 104. The principle is the same in both cases—in neither, was there any contract—in both, there was a conversion. Or, suppose that the Central Rail Road Company, finding a slave at the Oconee river, with a general pass, should put him to work for an hour, or a day, upon the bridge over that stream, and, after completing the work assigned him, in getting off from the bridge, he should accidentally fall into the river and perish, it is clear that the user would be a conversion, and the company would be liable. Now, how, in principle, does this case differ from those supposed? It is true, that the plaintiffs in error did not put the slave to do work of any kind; but they, in the line of their business, as carriers, did receive and appropriate the body of the slave, for the purpose of a profit to themselves. They *used him* for that purpose. If, instead of a living man, they had taken, for any incidental advantage to themselves, a bag of cotton belonging to the defendant, without his consent, and it had been destroyed or damaged by fire, they would be held to have used it, and would be liable. More directly to the point—if a ship owner should take the heavy goods of another, (iron, if you please,) without his consent, for the purpose of ballast, with a view of transporting it to a point where the owner desired it to be transferred, and it should be lost by the sinking of the ship, it would be a conversion—an user. The advantage, in that case, would spring out of the iron subserving the useful, perhaps necessary purpose of ballast; in this case, the advantage springs out of the slave—he subserving the purpose of putting into their pockets the usual amount of fare. The increased risk, growing out of the reasoning, willing powers, of a living human creature, does not affect the principle. Cognizant of these properties in the chattel, they take the risk. For the purposes, however, of this argument, and, indeed, upon all the legal principles involved, we can consider the slave in no other light than as a bale of goods. I repeat, that the absence of any intention to do a wrong to the owner, does not change the legal character of the act—it is a conversion without that; and to this point, see *Willes' R.* 577, and *Nelson vs. Wetmore,* 1 *Richardson's R.* 322. The case of *Nelson vs. Wetmore,* decided by the Supreme Court of South Carolina, is very much in point, and sustains fully the view of this case, which I have presented. Wetmore, meeting with Nelson's slave—who had runaway from his master—as he traveled in

the stage to Washington City, from motives of benevolence, as it would seem, received him in the capacity of a servant, and passed him off on the road as such, paying a part of his expenses, and procuring his passage at servants' rate. At the City of Washington, he parted with the slave, who made his way North, and was lost to his owner. The action of trover was brought against him for the negro, with counts for damages. The Supreme Court of South Carolina sustained the trover count, upon proof of conversion, substantially as stated above, and ordered a new trial, alone upon the ground, that, inasmuch as the slave was a mulatto, and therefore, did not furnish, in his color, *prima facie* evidence of being a slave, and passed himself as free, it ought to be left to a Jury to determine whether the defendant, *Mr. Wetmore*, regarded him as free or as a slave. Of course, the action of trover was sustained, upon the ground that the acts of the defendant, upon the assumption that he knew the man was a slave, were tortious. *Nelson vs. Wetmore, supra.* The case of *Mrs. Harris vs. Mabry*, decided by the Supreme Court of North Carolina, settles the same principle. The defendant and others, were owners of the Piedmont line of stages, and, by their agent, took the female slave of the plaintiff, without her consent, as a passenger, and transported her out of the State ; and an action was brought against them for damages. The Circuit Judge who tried the case, instructed the Jury, " that it is a principle of law, that when one person caused damage to another, by an act which he had no right to do, he was responsible for the injury; and in this case, the defendant *had no right to carry off the slave of the plaintiff, in the stage, without her permission.*" The case was taken up, and the Supreme Court affirmed the decision of the Court below, saying, " on this point, the Judge charged the Jury, that the plaintiff had a right to expect full compensation for all the injury sustained by the wrongful acts of the servants of the defendant, in doing his business, and to be placed in the same situation she would have been in, if the defendant's agents had not interfered ; that the plaintiff had a right to recover all such damages as could properly be considered the consequence of the acts of the defendant's agents, while in his service. We see nothing erroneous in this charge, &c." 1 *Iredell's Law Rep.* 240.

These principles do not apply alone to rail road companies and stage contractors, but are of general application. They are

not new, but are laid up among the settled doctrines of the Common Law. See, generally, *Countess of Rutland's case,* *T.* 38 *Eliz. B. R.* 1 *Roll. Abr.* 5 (*L.*) *pl.* 1. 2 *Wheat. Selwyn,* 1390. 6 *Mod.* 212. 4 *Term Rep.* 260. 6 *East.* 538. 6 *Bac. Ab.* 677. 7 *Johns. R.* 254. *Willes,* 577. 1 *Richardson's R.* 321. 1 *Iredell's Law R.* 242. 5 *Mass. R.* 104. 3 *B. & Ald.* 685. 12 *Pick. R.* 136. 2 *Starkie's N. P. C.* 306. 7 *Bingh. R.* 298.

Let the judgment of the Court below be affirmed.